IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MICCOSUKEE TRIBE OF INDIANS OF FLORIDA D/B/A MICCOSUKEE INDIAN GAMING,<br><br>    Plaintiff,<br><br>v.<br><br>GREAT AMERICAN INSURANCE COMPANY,<br><br>    Defendant. | Case No.:<br><br>**COMPLAINT FOR BREACH OF CONTRACT AND JURY DEMAND** |

## COMPLAINT

COMES NOW, Plaintiff, Miccosukee Tribe of Indians of Florida d/b/a Miccosukee Indian Gaming ("Miccosukee Tribe" or "Plaintiff"), by and through undersigned counsel, and files this Complaint against Defendant, Great American Insurance Company ("GAIC" or "Defendant"), and in support thereof alleges as follows:

### THE PARTIES

1.  Plaintiff, the Miccosukee Tribe, is a federally recognized Indian tribe with its headquarters located in Miami-Dade County, Florida.

2.  Defendant, GAIC, is incorporated in the State of Ohio, with its principal place of business located in Cincinnati, Ohio and regularly conducts business as an insurance company throughout the State of Florida, including in Miami-Dade County.

### JURISDICTION AND VENUE

3.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of $75,000.

4. This dispute arises from GAIC's breach of an insurance contract that insures risk for losses sustained resulting directly from criminal acts including, but not limited to, employee theft.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) as a substantial part of the events and omissions giving rise to the claims that are the subject of this litigation occurred within this judicial district.

## FACTUAL ALLEGATIONS

6. Miccosukee Resort & Gaming ("Miccosukee Gaming") is a gaming establishment ("Gaming Facility") in Miami-Dade County, Florida, operated and licensed by Plaintiff.

7. GAIC issued Commercial Crime policies to Plaintiff for the annual policy periods commencing on October 1, 2014 and ending October 1, 2019 (the "Policies"). True and correct copies of the Policies are attached hereto as **Composite Exhibit A**.

8. The Policies each provide, for their respective policy period, $5,000,000.00 of coverage for Employee Theft, subject to a $50,000.00 deductible.

9. In or about early May 2015, Plaintiff received an anonymous report indicating that Video Technicians employed by the Plaintiff at the Gaming Facility were manipulating gaming machines to create "ghost credits" (further defined herein), and then exchanging the ghost credits for cash. As this report was made anonymously, Plaintiff did not know, and could not have known, the veracity of the allegation nor the precise nature, methodology, and extent of the alleged conduct.

10. Plaintiff conducted an initial investigation into the anonymous report that concluded on or about May 28, 2015. While Plaintiff still had limited information regarding the alleged conduct, Plaintiff was able to observe one video technician accessing gaming machines

which showed video vouchers being inserted into the gaming machines during a time when there were no customers playing on the gaming machines. Based on the facts available to Plaintiff at that time, Plaintiff believed that the employee theft totaled $16,478.22, a figure well within the deductible in Plaintiff's Policies.

11. The initial investigation could not identify the method used to accomplish the theft, how many employees or individuals were involved, or the extent and duration of their involvement.

12. The matter was then referred to the Miccosukee Police Department (the "Police"), who commenced its own investigation on June 11, 2015. The Police could not definitively identify the manipulation methodology and therefore could not detain the alleged perpetrator.

13. The Police continued its investigation in search of additional evidence to support possible future criminal charges, but no such evidence was found, and none were ever pursued.

14. Despite the fact that the gaming manipulation scheme could not be proven sufficiently for criminal charges against the alleged perpetrator, in an abundance of caution, Plaintiff terminated the alleged perpetrator identified in its initial investigation, while continuing to investigate other potential participants.

15. Plaintiff then contacted the Federal Bureau of Investigation ("FBI") to further investigate, identify and pursue any individuals who might be responsible for the employee theft.

16. The FBI immediately began its own investigation and issued a directive to Plaintiff not to discuss the matter with *anyone* until it was concluded.

17. Plaintiff complied with this directive, still believing the theft was less than Plaintiff's deductible.

18. Utilizing all of the resources available, including the Police and the FBI, Plaintiff began the long and tedious process of unraveling the theft scheme.

19. During this time, Plaintiff also hired an internal auditor specializing in the gaming industry tasked with investigating and certifying the employee theft upon the FBI's request for the same.

20. Due to the gaming systems in place, and what would ultimately be determined as the elaborate nature of the employee theft, which involved several employees working in collusion, the investigation took a significant amount of time and effort.

21. This was particularly difficult as the investigation into the employee theft was still underway to determine when the scheme started, as well as the number of individuals involved.

22. The internal auditor concluded her investigation on August 17, 2017, when she issued a report with her full findings.

23. It was not until that time that the precise nature of the crime was fully revealed, and the scope, intricacy, and magnitude of the loss first realized.

24. The perpetrators of the employee theft had been manipulating the video gaming machines by creating "ghost credits," where the machines would produce credits without any payment for the same. The perpetrators would then cash in these credits. Rather than an isolated incident involving a singular, simple manufacturing and exchange of ghost credits, the scheme had been ongoing for more than 4 years, from approximately January 2011 to May 2015.

25. The scheme involved multiple individuals, executing on a coordinated and carefully orchestrated plan involving manipulation of the gaming machines to register money or credits that were never actually deposited.

26. It was during that time that the damages were determined to be at least $5,283,637.50; significantly more than the initial determination of $16,478.22.

27. The investigation concluded by providing a draft letter to be sent to the FBI, detailing its findings to aid in the FBI's ongoing investigation.

28. The FBI continued its investigation, and on July 16, 2019, a grand jury indictment was delivered regarding the employee theft (the "Grand Jury Indictment").

29. Once the Grand Jury Indictment was delivered, Plaintiff was no longer barred from discussing the employee theft with others, and promptly reported the loss to GAIC on August 8, 2019.

30. Once Plaintiff was allowed to discuss the loss, it submitted the claim to GAIC and cooperated with every request from GAIC and followed all of the requirements under the Policies.

## **THE CLAIM**

31. Over a five (5) year period starting in January of 2011 through May of 2015, the defendants as named in the Grand Jury Indictment, now former employees of Miccosukee Gaming, utilized gaming machines at the Miccosukee Gaming facility to generate false and fraudulent credit vouchers (i.e., "ghost credits), which they then exchanged for cash from Miccosukee Gaming.

32. The review conducted by the Miccosukee Tribe revealed the losses sustained as a result of the criminal activities as alleged in the Grand Jury Indictment were in the amount of $5,283,637.50.

33. Plaintiff submitted its claim for the losses sustained as a result of the employee theft (the "Claim") to GAIC and from August of 2019 to April of 2021, Plaintiff cooperated with GAIC and had no reason to believe that there was any issue with its Claim.

34. GAIC engaged the Plaintiff in a lengthy claim adjustment process, taking 20 months to provide a coverage position on the Claim.

35. During that time, Plaintiff provided GAIC with all the information it requested, including its internal accounting for the Claim. As the employee theft was now public and present in the media, GAIC also had the benefit of the information provided by the media coverage, and the information and outcome of the trial stemming from the FBI's investigation.

36. GAIC was aware of all relevant dates for the Claim from its inception; yet, GAIC treated the Claim like it was going to be paid and gave Plaintiff no indication that it was subject to any procedural notice issue.

37. Plaintiff relied on GAIC's actions and representations in investigating the Claim to make financial and legal decisions based on its belief that GAIC was going to pay the Claim once the total loss amount was verified.

38. On August 26, 2020, GAIC had its forensic accountant meet with Plaintiff and a detective from the Police to verify the numbers for the Claim.

## THE COVERAGE DENIAL

39. Almost twenty months into the Claim adjustment, and with no previous warning, GAIC denied Plaintiff's Claim on April 8, 2021.

40. The denial of the Claim was to Plaintiff's detriment, as it caused Plaintiff to not only carry the burden of the loss for the additional twenty-month investigation, but indefinitely.

41. This denial was then reaffirmed by GAIC on May 27, 2021.

42. GAIC claimed in its denial that Plaintiff failed to provide timely notice and the Policies providing coverage for the loss were cancelled by the time notice was given.

43. However, Plaintiff gave GAIC notice of the loss as soon as possible, as required under the Policies.

44. GAIC claims that Plaintiff discovered the loss no later than May 28, 2015.

45. However, Plaintiff did not discover the loss until August 17, 2017, and was then prohibited from discussing the loss, and hence, providing notice, until after the Grand Jury Indictments were delivered on July 16, 2019.

46. Had GAIC denied the Claim from the onset, Plaintiff could have made alternative financial decisions to accommodate for the loss, as well as taking legal action earlier to recover its losses to lessen the time Plaintiff was required to carry the loss without the reimbursement it is rightfully entitled to under the Policies.

## COUNT I - BREACH OF CONTRACT

47. The Miccosukee Tribe repeats and realleges the allegations of paragraphs 1 through 46 as though fully set forth herein.

48. GAIC, in consideration of premiums paid by the Miccosukee Tribe, duly executed and delivered to the Miccosukee Tribe the Policies – i.e., insurance contracts.

49. The Miccosukee Tribe provided timely and sufficient notice of the Claim.

50. The Miccosukee Tribe is, and at all relevant times was, in compliance with all conditions precedent for coverage under the terms of the Policies.

51. GAIC is obligated pursuant to the terms of the Policies to pay for (among other things) the cost of losses it sustained for the criminal acts as described more fully in the indictment.

52. Despite demands, GAIC unreasonably refused and/or otherwise failed to pay the Miccosukee Tribe for coverage benefits due and owing to the Miccosukee Tribe under the Policies' terms.

53. GAIC's refusal and/or failure to pay coverage benefits due and owing to the Miccosukee Tribe constitutes a breach of the Policies.

54. As a result of GAIC's refusal to provide coverage, the Miccosukee Tribe has suffered damages and will continue to suffer damages in the future.

55. As a result of GAIC's failure to provide coverage, the Miccosukee Tribe has been forced to retain the services of the undersigned counsel to pursue its rights under the Policies and has agreed to pay a reasonable fee for services and costs regarding its representation in this matter.

The Miccosukee Tribe is entitled to recover its reasonable fees and costs pursuant to Fla. Stat. § 627.428 and other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, the Miccosukee Tribe prays for judgment and the following relief against GAIC:

1. Monetary damages associated with the Claim, including, but not limited to, all direct, actual, and consequential damages resulting from GAIC's breach of the Policies and failure to pay coverage benefits due and owing thereunder;

2. Pre-judgment and post-judgment interest as permitted by law;

3. Attorneys' fees and costs, including, but not limited to, those available pursuant to Fla. Stat. § 627.428; and

4. Such other legal and equitable relief that this Court deems just and proper.

## JURY DEMAND

The Miccosukee Tribe hereby demands a trial by jury for all claims herein for which a jury is permitted.

Dated: December 8, 2022         SAXE DOERNBERGER & VITA, P.C.

By: /s/Stephanie A. Giagnorio
Stephanie A. Giagnorio, Esq.
Florida Bar No. 116557
Gregory D. Podolak, Esq.
Florida Bar No. 122087
999 Vanderbilt Beach Rd., Suite 603
Naples, FL 34108
Primary: sgiagnorio@sdvlaw.com
Primary: gpodolak@sdvlaw.com
Secondary: charper@sdvlaw.com

*Attorneys for Plaintiff*